# REPUBLIC NATIONAL LIFE INSURANCE COMPANY
## v. RUTH A. HALL.

No. A-2600. Decided June 28, 1950.
Rehearing overruled October 11, 1950.
(232 S. W., 2d Series, 697.)

*J. Willard Gragg* and *Charles H. Storey,* both of Dallas, for petitioner.

The Court of Civil Appeals erred in holding that Mr. Hall impliedly agreed to accept any reasonable premium, by leaving the space blank for the insurance company to fill in the proper amount; that there was nothing further to negotiate and that Mr. Hall had an enforceable policy at the time of his death. American National Life Ins. Co. v. Brawner, 93 S. W. 2d 450; Wallingford v. Home Mutual Fire and Marine Ins. Co., 30 Mo. 46; United Fidelity Life Ins. Co. v. Handley, 86 S. W. 2d 201.

*Seaberry & Hagman,* of Weatherford, *Hill, Paddock & Langdon, Homa S. Hill,* and *Burton B. Paddock,* all of Fort Worth, for respondents.

The Court of Civil Appeals correctly held that the policy of insurance was issued in accord with Hall's application, and that Hall had authorized the insurance company to fill in the proper amount of the premium, and that his policy was in full force and effect at the time of his death. Pardee v. Universal Life Ins. Co. 170 S. W. 2d 852; Sentinel Fire Ins Co. v. Anderson, 196 S. W. 2d 649; Lowry v. American Ins. Union, 62 Fed. 2d 209.

MR. JUSTICE GARWOOD delivered the opinion of the Court.

Respondent, Mrs. Ruth A. Hall, sued petitioner, Republic National Life Insurance Company, as alleged insurer, for respondent's benefit, of the life of her husband, George W. Hall, who was killed in an airplane accident on April 10, 1949, in Wyoming. The petitioner company denied the existence of an insurance contract on several grounds, one of which was that there had been no agreement as to the essential matter of the premium rate. The only jury findings were that respondent's reasonable attorney fees amounted to $2000 and that both Mr. Hall and petitioner intended the hereinafter mentioned policy to become effective when mailed by petitioner to its local agent

shortly before Mr. Hall's death. The judgment of the trial court in favor of respondent for the amount of the policy and attorney fees was reformed by the Court of Civil Appeals so as to eliminate the attorney fees for reasons not here questioned by respondent, and was otherwise affirmed. 226 S. W. 2d 901.

There has not been any material dispute about the facts, which in substance are as follows: The deceased, who resided in California but was President of Weatherford Manufacturing Co., of Weatherford, Texas, made application at Weatherford in the latter part of March 1949, for a twenty-year-payment type of policy in the amount of $20,000 through a Mr. Coder, the local soliciting agent of petitioner, on petitioner's usual printed form, which Mr. Hall, of course, signed. At that time, Mr. Hall was 36 years old, and was evidently understood by himself and the solicting agent to be in some undetermined degree "overweight" from a life-underwriting standpoint, so as probably to require of him a premium higher in some unknown amount than that of approximately $640 per year, which was normal for an applicant of his age. The agent testified that he told Mr. Hall, "I didn't know what the rate would be; that it would have to be a special rate case." At the same time he testified as follows: "Q. What did George (Mr. Hall) tell you in response to that; he told you he wanted the insurance? A. Yes; I told him that was what we could get." Mr. Hall's secretary was allowed to testify that on the date of the application and in the presence of the agent, Mr. Hall told her that he was going on a trip to the West, wanted insurance and that "when these policies came in I was to put them in the safe." (A "group" policy was also involved in the negotiations but not in this suit.) Previously to these transactions, Mr. Hall had been negotiating with another company than petitioner and had been quoted an annual premium rate of $40 per thousand dollars of insurance but had evidently gone no further with these negotiaions, and told petitioner's agent, "I want you to beat that other man's premium." It was also understood between Mr. Hall and the petitioner's agent that, Hall being a licensed airplane pilot, accustomed to fly the plane of his company on business trips, the insurance would include coverage for death suffered in any such flight, the additional premium for such coverage being an amount evidently not subject to variation and Hall having executed contemporaneously with his application the usual company form questionnaire describing his flying activities.

The application contained a blank space for the amount of

the premium, which was not filled in. It also contained another blank space entitled "Home Office Corrections or Additions", which, of course, was not filled in by Mr. Hall or the agent, and a corresponding provision in the form of an agreement of Mr. Hall just preceding his signature, that "my acceptance of any policy issued on this application will, without further notice, constitute a ratification by me of any correction in or addition to this application made by the Company in the space provided for 'Home Office Corrections or Additions.'" (As hereinafter mentioned, this blank was later filled in by the home office of petitioner with the words "Policy issued at rated age 44 with extral annual premium of $100.00. No extended insurance. Premium is $72.94"). The last line of the executed application read, "I have paid the Agent taking this application cash $_____being the Mo. S. S. premium hereon."

At the time of making his application, Mr. Hall signed and delivered to petitioner's agent a "Salary Deduction order" reading: "I hereby authorize my employer, _____, to pay the monthly premium of $_____, on my Policy No._____, to the Republic National Life Insurance Company and deduct said amount from my salary each month, until further notice in writing."

Mr. Hall underwent a medical examination contemporaneously with his application; the latter, the report of the examination, aviation questionnaire and salary deduction order being all seasonably forwarded by the agent to the home office of petitioner and received there on or before March 24th, the day Mr. Hall left Weatherford on his contemplated trip.

Without further communication between any of the parties, petitioner, on or about April 7, 1949, issued a policy purporting to insure Mr. Hall in the amount and on the twenty-year-payment plan applied for, and on April 8th procured an endorsement to be made thereon by the State Department of Insurance, stating that the policy was "Registered" and that "Approved Securities equal in value to the Legal Reserve hereon are held in trust by the Commissioner of Insurance of the State of Texas." The policy was then mailed to the agent, being received by him on April 9th at Aledo, his residence, near Weatherford. As before indicated, petitioner, without communicating with Mr. Hall, had "rated up" his age from 36 to 44 so that his premium was $72.94 per month or about $876 per year (including $100 per year or about $8.50 per month aviation coverage) as against a normal premium lower by about $140 per year; the monthly

premium being inserted by the company in the "Home Office Corrections or Additions" space in the application, which was attached to the policy,, and also stated elsewhere in the policy. The latter was dated May 1, 1949, but was accompanied by a printed slip bearing the company name and stating "For convenience this policy has been dated to conform with Payroll Deductions or Bank Service Order arrangements applicable to this case. If the policy as issued is on the plan applied for without modification it is now in force, otherwise it will be in force from the date it is accepted by the applicant."

The agent made no effort to deliver the policy upon its arrival on April 9th, or on Sunday the 10th. On the 10th, Mr. Hall, who had never returned to Weatherford since his departure on March 24th, was killed, and the agent, learning of his death, returned the policy to the petitioner.

■ While respondent's claim excites no less sympathy than the many other cases in which death overtakes the husband or father who has applied for life insurance later than he realized, we are compelled, under applicable and sound principles of law, to reject it. Except for a relatively few rules especially favoring the insured or beneficiary, which are inapplicable here, life insurance transactions are to be judged upon the same basis as any other business contracts or negotiations therefor. Texas, like most other jurisdictions, has not adopted the theory sometimes advanced, that insurance is a matter of relationship or status rather than contract. See "The Delivery of a Life Insurance Policy" by Edwin W. Patterson, 33 Harv. L. Rev., 198. Since as early as Connecticut Mutual Life Insurance Company v. Rudolph, 45 Texas 454, our courts have spoken of life insurance in the usual contract law terms of an agreement evidenced by an offer and its acceptance; in the ordinary case the application of the prospective insured being the offer and the delivery of the policy by the prospective insurer being regarded as the acceptance.

But as in the case of all contracts, the offer and acceptance in insurance negotiations must be such as to evidence a complete agreement, or no obligations arise. "For acceptance by the insurer to constitute a completion of the contract, without action by the insured, such acceptance must be of the terms and conditions exactly as proposed by the application. If the insurer accepts the application only upon certain conditions being met, or proposes a new form of contract with new terms and provisions, that action of the insurer amounts to a rejection of the

original proposition, and a counter offer which must be accepted by the insured in order to consumate the transaction." Appleman, Insurance Law and Practice, sec. 7151, (Vol. 12, p. 203). See also Williston on Contracts, Revised Ed., sec. 70 n. 2; Springfield Fire & Marine Ins. Co. v. Hubbs-Johnson Motor Co., Tex. Com. App., 42 S. W. 2d 248; Salisbury v. Indiana & Ohio Live Stock Ins. Co., Mo. App., 202 S. W. 412; Wallingford v. Home Mutual Fire & Marine Ins. Co., 30 Mo. 46; American Ins. Union v. Lowry, C. C. A. Tex., 62 F. 2d 209; Morford v. California Western States Life Ins. Co., 166 Or. 575, 113 Pac. 2d 629; Field v. Missouri State Life Ins. Co., 77 Utah 45, 290 Pac. 979. The same principle is recognized in United Fidelity Life Ins. Co. v. Handley, Tex. Com. App., 86 S. W. 2d 201, which sustained recovery against the insurer on the theory that the terms upon which it "agreed" to insure the applicant, though differing from the original application, were in turn accepted by the applicant.

■■ An essential element to be agreed upon in a life insurance contract is the amount of the premium. Appleman, sec. 7151, supra; 1 Couch, Cyc. of Ins. Law, sec. 60; Wallingford v. Home Mutual Fire & Marine Ins. Co.; Haynes v. Midland Nat. Life Ins. Co.; Field v. Missouri State Ins. Co., all supra; Pacific Fire Ins. Co. v. Donald, 148 Texas 277, 224 S.W. 2d 204, 207. In the fire insurance case last cited, our holding that, "Since the rates had been fixed by the State Insurance Commission, it was not essential that they be specifically agreed to by the parties", evidently means, first, that the subject matter of premium must be in the contract either expressly or by implied reference to official regulations, and secondly, that in the matter of *life* insurance, the rates for which are not fixed by the State, the premium must be expressly agreed upon.

Now the present case is one in which Mr. Hall made what would be a rather formal and detailed offer, except that it left a blank for the essential subject matter of the premium. It was received by the petitioner company, which issued and sent to its agent a policy providing for a specific premium based obviously on its own estimate of Mr. Hall as an individual or special risk. Mr. Hall died without knowledge of the policy and so without ever agreeing to the premium specified therein. The situation is much the same as if he had made a letter-offer to a landowner to buy a particular piece of land "for a cash consideration of $_____", and the landowner had proceeded to insert a figure of $10,000 in the blank, sign an "acceptance" at the foot of the letter and return it to Mr. Hall. One would hardly

contend that Mr. Hall became bound to buy the land for $10,000, when the landowner dropped the returned letter in the mail box or even at the moment Mr. Hall received it and decided in his own mind that the price was satisfactory. The returned letter is not an acceptance but is itself an offer to the original "offerer". We agree with petitioner that Mr. Hall's application, with the premium left in blank, was in effect a mere invitation to petitioner to make him an offer with a specified premium and that, such offer never being made known to him it was never accepted so as to make a contract. If Mr. Hall had lived to receive the policy he could yet legally have refused to pay the premium, because he had never agreed to pay such a premium.

Respondent argues that the application in effect offered to pay whatever premium might be reasonable (though obviously in excess of the normal premium charged by petitioner for a man of Mr. Hall's age, which petitioner, by "rating up" the risk had clearly refused to approve). As to just what figure above the normal would be "reasonable", one can readily see how Mr. Hall and petitioner or petitioner and other insurance companies might well differ between themselves, nor is there anything in the record to show that the figure actually fixed on by petitioner was "reasonable" or "standard" under the circumstances. Such a theory would, in effect, substitute the opinion of twelve jurors for that of the parties and doubtless entail evidence as to what this or that other insurance company would charge under similar conditions of excess weight and such medical data as petitioner's medical examination afforded.

A rather similar situation was involved in Salisbury v. Indiana & Ohio Live Stock Ins. Co., supra, which was decided by one of the Missouri Courts of Appeal, but has never been overruled and has been referred to by the Supreme Court of that state and at least one other state without criticism. In that case the amount of insurance was left in blank by an applicant for fire insurance, following an earlier application for specified amounts, which the company had returned with request for more information about the cost of the property and with the statement that, on receipt of such information, "we will do the very best we can". The insurance agent, without the applicant's knowledge, filled in the blanks with amounts somewhat less than those of the original application. The company on receipt of the new application sent the agent policies for still lower amounts than those he had inserted, instructing him to return them if they were rejected by the applicant or deliver them against payment of the premium if the property were then in

insurable condition. After the agent had countersigned the policies but before he sought to deliver them, the property was destroyed by fire. In attempting collection, the applicant contended "that because the company, upon the receipt of the original applications, wrote that if the applications were resubmitted with some new information, 'we will do the very best we can'—that is to say, write as much insurance on the animals as they could—and plaintiff submitted new applications to the agent with the amount left blank, that plaintiff thereby agreed that he would accept any amount of insurance that might be written upon the stock, and that when the policies were written the contract was complete." The court agreed that the case was one of an application with the amount left in blank but expressly rejected the conclusion that the applicant had thus made such an offer as could become a contract without further act of assent by him to the amounts in which the policies were issued. The decision is, therefore, a definitely stronger authority against respondent's position in the instant case than the Missouri decision of Wallingford v. Home Mutual Fire & Marine Ins. Co., supra, in which it was said by way of dictum that even if the agent had not filled in the premium blanks in the application, as he did, the assent of the applicant to the higher premium specified in the policy would have been a necessary prerequisite to a contract.

Sentinel Fire Ins. Co. v. Anderson, Tex. Civ. App., 196 S. W. 2d 649, cited by respondent and the court below, does contain a statement to the effect that the rules regarding blanks in deeds and negotiable instruments apply to blanks in any type of contract with a party thereto executes and leaves with the other party, though the decision was rested primarily on an altogether different ground. It is in no event persuasive in the instant case, in which there is no suggestion that the parties ever agreed orally or otherwise on a specific premium figure to be inserted and in which the instrument containing the blank was obviously not one intended to evidence (but for the blank) a completed transaction, like the settlement agreement in the Anderson case, or like the deeds and negotiable instruments in the decisions to which that case refers.

Cases of general insurance for emergency or temporary purposes such as Rossi v. Firemens Ins. Co. of Newark, N. J., 310 Pa. 242, 165 Atl. 16 and Scammell v. China Mutual Ins. Co., 164 Mass. 341, 41 N. E. 649, 49 Am. St. Rep. 462, should not we think be extended to life insurance, especially in situations like the

present, in which no emergency or temporary coverage was contemplated.

Viewing the instant controversy in a somewhat different way, Mr. Hall's application amounted to no more than an invitation for an offer, not only by its mere failure to state a premium, but also by its express language aforementioned to the effect that any "Home Office Corrections or Additions", for which the application provided a space, would not be binding upon Mr. Hall unless he accepted the policy. Similar provisions have been applied so that, where the insurer proceeds to issue a policy with a premium higher than that applied for, and the policy is accepted, the premium obligation of the insured dates only from the acceptance, and the accrual of later premiums is postponed accordingly, regardless of the date of the policy. See Haynes v. Midland Nat. Life Ins. Co., 60 S. D. 212, 244 N. W. 110. Here Mr. Hall, omitting to give a premium figure in his application, necessarily contemplated that a figure would be tendered by the home office by way of an "addition", which would become binding upon him when, but only when, he accepted the policy. He never accepted the policy because he did not live to know it had been issued.

The testimony of the officers of petitioner in the light of the documentary facts amounted to no more than saying that the policy would not have been written if Mr. Hall had not made his application and that the policy was in the amount and on the 20-year-payment plan stated in the application. This is quite different from saying that Mr. Hall and the company had agreed on all essential details of the insurance, including the amount of the premium. That the premium named by the petitioner in its policy was necessarily one satisfactory to petitioner naturally does not suggest that it was agreed to, or even that it would likely be acceptable to Mr. Hall.

■ That Mr. Hall "wanted insurance" for $20,000 on the 20-year-payment plan is quite plain from his application without reference to the oral evidence to the same effect. In his own mind he might have wanted it at whatever cost, though the evidence indicates the contrary. Conceivably the testimony of his secretary could be taken to mean that he expected to receive a policy with a premium that would be satisfactory to him. But none of this goes to prove that he ever agreed on a premium or even that he agreed to pay whatever premium might be charged. And in the face of the terms of the application "that no statements, promises, representations, notices of information

made or given by or to the person soliciting or taking his application \* \* \* shall be binding on the Republic National Life Insurance Company, or in any way affect its rights unless same shall be reduced to writing and submitted to the Company at its Home Office as a part of this application", whatever Mr. Hall may have said to his secretary in the presence of the agent would be without effect here in any event.

The jury finding that Mr. Hall and petitioner both intended the policy to be effective when it was mailed to the agent may be disregarded. The question is what, if anything, the parties agreed to, not what they "intended", and since the evidence on this point was almost entirely documentary, and in any event undisputed, the decision to be made therefrom was one of law rather than fact.

The foregoing conclusions are not affected by the printed form sent with the policy to the agent, including the statement: "If the policy as issued is on the plan applied for without modification it is now in force, otherwise it will be in force from the date it is accepted by the applicant." Clearly Mr. Hall was not misled by that statement because he never saw it. Nor, being an ex parte statement of petitioner, could it in any way affect the right of Mr. Hall, had he lived, to reject the policy because of the amount of the premium. As applied to the facts of the particular case its meaning, for whatever relevance it may have, was simply that the policy would not be effective until accepted by Mr. Hall, because of the "Home Office Corrections or Additions" which petitioner made on the application by writing a particular premium therein.

■ Petitioner's "registration" of the policy with the State Insurance Commission did not create a contract when one otherwise did not exist. No statute gives such "registration" this effect, nor did Mr. Hall ever know about it, so as to be in any way misled by it. Like the abovementioned notice form sent the agent, it could in no event have deprived Mr. Hall of his right to reject the policy if dissatisfied with the premium.

The judgments of both courts below are reversed, and the case having evidently been fully developed, judgment is here rendered that respondent, Mrs. Ruth A. Hall, take nothing by her suit.

Opinion delivered June 28, 1950.

MR. JUSTICE TAYLOR dissenting.

I respectfully dissent from the majority holding that the facts show *as a matter of law* that on account of a lack of a meeting of minds, the life insurance contract in question was not made. I am of the opinion that the testimony raised the special issue submitted to the jury inquiring whether the contract intended to be made was made. The jury's finding is that the insurance company and the applicant so intended.

The pertinent testimony, as is later shown, evidences the requisite mutual intention to make the policy contract sued on. The trial judge so viewed it, the jury so found, and the Fort Worth Court of Civil Appeals, being of opinion the evidence was sufficient to so show, upheld in a unanimous opinion the judgment rendered by the trial court on that finding. In fact the probative testimony is almost without dispute to that effect.

The essential facts, stripped of irrelevant surplusage, are that the applicant, George A. Hall, an airplane pilot, preparatory to leaving on a two month's airplane trip, told the company's agent with whom he was accustomed to deal, that he wanted a $20,000 life policy, filled out an application therefor and, since the agent did not know exactly what the monthly premiums would figure, gave him a salary deduction order for $_____ for the monthly premiums on the corporation (at Weatherford) of which Hall was president, to send with the application, as payment. The insurance company considered the application, the report of Hall's physical examination and all other material matters (taking about two weeks to do so), accepted and retained the salary deduction order, issued the policy on the application made, attached the policy thereto, and mailed it to the agent. The applicant was in good health, was only 36 years old, but was in some measure overweight, necessitating that he be rated a few years (not known to the agent just how many) older than 36 years. There is no suggestion that the applicant was not in good health or that the agent and he were in collusion. Hall by executing and delivering the payment order in blank, thereby agreed in advance that the company might determine the applicable rate, which it did and wrote it in the policy. The company accepted the application, retained the order, issued the policy, set up the required security reserve and, before mailing the application with policy attached, to the agent, sent it to Austin for registration with the insurance commissioner. There was no variance between the application and attached policy.

The majority opinion proceeds on some theory of the com-

pany's having made a counter offer to issue Hall a policy, which was pending when he was killed, and that therefore the parties did not intend to make the contract issued to Hall. The majority opinion decides the case on the identical point of whether the premium could be collected from Hall. This point depends upon whether the company and he intended to make a contract, which is the basic question involved.

Mr. Campbell, Assistant Secretary and Manager of the company's policy-issue department testified that no policy was ever issued unless there was an application for the policy, and that the application, when attached, became part of the policy contract; also, he testified, that in issuing the policy in question the company had Hall's application for it, that it issued the policy on that application, and neither requested nor required another. In other words, Hall's application was the basis on which the company issued Hall his policy.

The policy was dated May 1, when issued on April 7, 1949, but provided that unless otherwise agreed in writing (and there is no other agreement) the policy dates back to the time of the application. The company's secretary testified, and the policy reveals, that no requirement of delivery is made by its terms. That requirement was omitted from the policy. As stated in 1 Cooley's Briefs on Insurance, p. 633, loc. cit. p. 627, actual delivery (absent such requirement) is not essential to the validity of the contract. 1 Couch on Insurance (First Ed.), p. 222 et seq. and U. S. Fidelity Life Ins. Co. v. Handley, 86 S. W. 2d 201, are to the same effect. It is not fatal, *as a matter of law* to the making of a contract that a blank amount is to be filled in when one party trusts it to another in the narrow range here involved of rating up a healthy 36-year-old man because he is somewhat overweight. Sentinel Fire Ins. Co. v. Anderson, 196 S. W. 2d 649; 2 Tex. Jur. 708. In other words the principle of a *signer's* agreement to leave blank an uncertain amount to be filled in by the other party who has the means of ascertaining the correct amount, has been held to be, and is, under the present facts, a sound principle.

Provision for delivery was omitted from Hall's policy. Hall and the agent knew manual delivery would be impossible as Hall was going in too short a time on the trip (in which his airplane crashed and killed him) for that to be done; and consequently they left no detail unattended to before Hall left. The jury doubtless gave consideration to the matters pointed out above as a basis for making its finding that the insurance

company intended the policy to become effective immediately upon mailing it.

Both the company and Hall acted under the assumption that they had made a contract, as appears above. The actions of both, considered together as they must be, raised an issue of fact, to say the least, as to whether the policy contract was intended. The trial judge submitted the issue and the jury found in response "that George Hall and the * * * company intended said * * * insurance to become effective immediately, at the time of mailing said policy * * * without any further action on the part of * * * Hall." In my opinion no basis is found in the record for the holding as a matter of law contrary to the foregoing finding.

Furthermore, there was no change of face, or question, on the part of the company until it learned of Hall's death which occurred just two days after it mailed the policy. The recovery by Mrs. Hall in the courts below on the finding made, in my opinion, should be upheld by this Court.

Opinion delivered June 28, 1950.